Louis A. Karasik (State Bar No. 100672)
lou.karasik@alston.com
Andrew E. Paris (State Bar No. 162562)
drew.paris@alston.com
Casondra K. Ruga (State Bar No. 237597)
casondra.ruga@alston.com
Mitra M. Eskandari-Azari (State Bar No. 261978)
mitra.azari@alston.com
**ALSTON & BIRD LLP**
333 South Hope Street
Suite 1600
Los Angeles, California 90071
Telephone: (213) 576-1000
Facsimile: (213) 576-1100

Attorneys for Plaintiff,
**DIRECTV, INC.**

FILED

10 MAR 22 PM 4:47

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

BY:＿＿＿＿＿＿＿

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

DIRECTV, INC., a California corporation,

Plaintiff,

v.

GEMS TV (USA) Limited, a Delaware corporation

Defendant.

Case No. **CV 10-02061-DDP**

**[REDACTED] COMPLAINT FOR:**

1. **BREACH OF CONTRACT**

2. **FRAUDULENT CONVEYANCE (Uniform Fraudulent Transfer Act, Cal. Civ. Code § 3439 et seq.)**

3. **FOR APPOINTMENT OF RECEIVER (Cal. Code Civ. Proc. § 564 et seq.)**

**DEMAND FOR JURY TRIAL**

LEGAL02/31815532v4

1

## SUMMARY OF ACTION

1.  This action is brought by DIRECTV, Inc. ("DIRECTV") to prevent defendant Gems TV (USA) Limited ("GemsTV") from taking threatened action to transfer all of its assets to the Cayman Islands so that no assets are available to pay DIRECTV over ▮▮▮▮▮▮▮▮ in damages caused by GemsTV's recent repudiation of the parties' contract. As detailed herein, GemsTV is a home shopping channel that pays DIRECTV a monthly fee to broadcast GemsTV programming on a 24/7 basis on the DIRECTV satellite TV service to over 18 million subscribers. ▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮ ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮. GemsTV has recently repudiated the contract, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, and has advised DIRECTV it is winding up its business and transferring its assets to its parent company, Gems TV Holdings Limited ("GemsTV Holdings"), an entity organized in the Cayman Islands that has no assets in the United States. DIRECTV sues GemsTV for breach of contract and fraudulent transfer and seeks temporary and preliminary injunctive relief to enjoin the transfer of GemsTV's assets that would render GemsTV judgment proof from their certain liability to DIRECTV.

## JURISDICTION AND VENUE

2.  The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332. There exists complete diversity of citizenship between DIRECTV and GemsTV and the amount in controversy exceeds $75,000, exclusive of costs and attorneys fees.

3.  Venue is proper pursuant to 28 U.S.C. § 1391(a) because a substantial part of the events giving rise to the claims herein, including the wrongful acts of GemsTV alleged herein that caused injury to DIRECTV, and the injury itself, occurred in this district. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

1

**THE PARTIES**

4.     DIRECTV is a California corporation with its principal place of business in El Segundo, California.  DIRECTV is the nation's leading provider of satellite television programming, with over 18 million subscribers in the United States.  DIRECTV delivers multi-channel programming, in both standard and HD format, from satellites in geosynchronous orbit above the earth.   DIRECTV's transmissions are known as a "direct to home" ("DTH") system because the satellite signal is sent directly to each customer's home.  The satellite signal is received using a satellite dish at the customer's home that is connected by cables to an Integrated Receiver Decoder that decrypts the satellite signal and is connected to the customer's television set to permit viewing of the programming.

5.     DIRECTV is informed and believes and thereon alleges that defendant GemsTV TV (USA) Limited ("GemsTV") is a Delaware corporation with its principal place of business in Reno, Nevada.  GemsTV operates a home shopping programming channel which sells gemstones and related jewelry under the tradename GemsTV. ███████████████████████████████████████
████████████████████████████████████████

6.     DIRECTV is informed and believes and thereon alleges that GemsTV is a wholly owned subsidiary of GEMS TV Holdings Limited ("Gems Holdings"), a limited liability entity in the Cayman Islands that is traded on the Singapore Stock Exchange.  DIRECTV is informed and believed and thereon alleges that Gems Holdings exercises substantial or complete control over and gives direction to GemsTV on operational issues.

**FACTUAL ALLEGATIONS**

**A.     The Business Relationship Between DIRECTV and GemsTV**

7.     On August 18, 2006, DIRECTV and GemsTV entered into an Affiliation Agreement (the "Contract") ████████████████████████████
████████████████████████████████████████

2



1   ████████████████   A true and correct copy of the Contract is attached hereto

2   as Exhibit 1. ████████████████████████████████████████████

3   ████████████████████████████  ████████████████

4      8.   ████████████████████████████  ████████████████

5   ████████████████████████████████████████████████████████

6   ████████████████████████  ████████████████████████

7      9.   The Contract provides ████████████████████████████

8   ████████████████████████████████████████████████████████

9   ████████████████████████████████████████████████████████

10   ████████████████████  ████████████████  ████████████

11   ████████████████████████████████████████████████████████

12   ████████████████████████████

13      10.   ████████████████, the parties executed an Amendment to the

14   Contract ████████████████████  ████████████████████

15   ████████████████████████████████████████████████████████

16   ████████████████████████████████████████████████████████

17   ████████████████████████████████████████████████████████

18   ████████████████████████████████████   A true and

19   correct copy of the Amendment is attached hereto as Exhibit 2.

20      11.   ████████████████████████████████████████

21   ████████████████████████████████████████████████████████

22   ████████████████████████████████████████████████████████

23   ████████████████████████████████████████████████████████

24   ████████████████████████████████

25      12.   ████████████████████████████████████████

26   ████████████████████████████

27      13.   ████████████████████████████████████████

28   ████████████████████████████████████████████████████████

3

14. █████████████████████████████

**B.**   **GemsTV Attempts to Renegotiate the Terms of the Contract**

15.   On February 16, 2010, senior representatives of GemsTV and Gems Holdings came to DIRECTV's offices in El Segundo to request that DIRECTV enter to new arrangements for distribution of GemsTV programming.  DIRECTV was informed that due to the economic downturn, GemsTV was losing money and might be forced to discontinue their programming activity. █████████

16.   DIRECTV declined to amend or modify the Contract and advised GemsTV and Gems Holdings that DIRECTV expected GemsTV to meet its contractual obligations.

4

LEGAL02/31815532v4

**C.** **GemsTV Repudiates the Contract and Gives Notice that it Intends to Transfer Its Assets to GemsTV Holdings**

17. On March 8, 2010, GemsTV gave DIRECTV written notice purporting to unilaterally terminate the Contract based on its decision to discontinue its business operations. ███████████████████████████████████

████████████████████████████████████████████████████████████

████████ ████████████████████████████████████████████████████

████████████ A true and correct copy of GemsTV's letter purporting to terminate the Contract is attached as Exhibit 4.

18. At or about the same time that DIRECTV received the letter purporting to unilaterally terminate the Contract, DIRECTV was advised of a public announcement by Gems Holding, the parent company of GemsTV, that a decision had been made to cease GemsTV's business operations and to wind down the company. A true and correct copy of the March 8 announcement is attached hereto as Exhibit 5. DIRECTV also learned at this time that Gems Holdings had entered into an investment agreement with Multimedia Commerce Group Inc. ("MMCG"), a company that operates Jewelry Television, another business engaged in marketing and distribution of jewelry products through satellite TV programming, and that Gems Holdings intended to use GemsTV's assets and inventory to acquire a 37.8% shareholding interest in MMCG as part of a $60 million investment in MMCG by Gems Holdings. A true and correct copy of the resolution of Gems Holdings' Board of Directors announcing the intended investment in MMCG is attached hereto as Exhibit 6. DIRECTV further learned that the proposed investment by Gems Holding in MMCG was a vehicle to "liquidate remaining [GemsTV] inventory" as the company winds up its operations. Attached as Exhibit 7 is a true and correct copy of an email from Gems Holding to DIRECTV reporting that information.

19. Upon receiving the March 8 letter from GemsTV purporting to terminate the Contract, DIRECTV took prompt steps to reject GemsTV's purported

5

notice of termination and to notify GemsTV that its actions violated DIRECTV's rights under the Contract.  On March 9, 2010, DIRECTV sent a letter to GemsTV stating that GemsTV is not entitled to unilaterally terminate the Contract and expressing DIRECTV's expectation that GemsTV would comply with its obligations under the Contract. ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ A true and correct copy of DIRECTV's response to GemsTV is attached hereto as Exhibit 8.

20.   On March 10, 2010, GemsTV responded to DIRECTV with a letter that continues to maintain that GemsTV is entitled to unilaterally terminate the Contract, ████████████████████████████████████ ████████████████ ████████.  A true and correct copy of GemsTV's March 10 letter is attached hereto as Exhibit 9.

21.   DIRECTV is informed and believes, based on the information provided to DIRECTV by GemsTV and Gems Holdings, that GemsTV is ceasing business operations and is in the process of winding down; that Gems Holdings has entered into an agreement to transfer the remaining assets of GemsTV to MMCG as part of an investment of $60 million; that GemsTV intends to transfer its assets and inventories to its parent company, Gems Holdings, or MMCG, without receiving any corresponding assets or other items of value; and that GemsTV intends to transfer its assets to Gems Holding or MMCG notwithstanding actual notice of DIRECTV's claims for breach of the Contract by GemsTV.  GemsTV thus seeks to transfer its assets in a fashion that will leave no assets available to compensate DIRECTV for damages caused by GemsTV's breach of the Contract.

22.   Gems Holding publicly advertises that one feature of its business is that it possesses no assets in the United States and that it is difficult for creditors to bring claims against Gems Holding because of its status as a Cayman Islands company.  According to Gems Holding, there is substantial question whether the

6

1   Cayman Islands would even recognize a US judgment against Gems Holdings.
2   Attached hereto as Exhibit 10 is a true and correct copy of these representations made
3   by Gems Holdings in a Gems Holdings announcement on the Internet found at
4   http://gemstv.listedcompany.com/misc/ipo.pdf.    GemsTV is now threatening to
5   transfer its assets to Gems Holdings, at the direction of Gems Holdings, in a manner
6   that would put GemsTV's assets out of the United States and possibly beyond the
7   reach of any claim by DIRECTV.

**FIRST CLAIM FOR RELIEF**

**BREACH OF CONTRACT**

10       23.   DIRECTV incorporates by reference each and every allegation
11   contained in paragraphs 1 through 22 as if set forth fully herein.

12       24.   DIRECTV has performed all terms and conditions and satisfied all
13   obligations owed to GemsTV under the Contract, except to the extent such
14   performance has been excused or prevented by GemsTV.

15       25.



20       26.   GemsTV has breached the Contract with DIRECTV by, among
21   other things, repudiating the Contract,

23   and purporting to unilaterally terminate the Contract. GemsTV's
24   actions are inconsistent with or contradict the terms and conditions of the Contract
25   and constitute a breach of the Contract.

26       27.   As a direct and proximate cause of GemsTV's breaches as
27   hereinbefore alleged, DIRECTV has been substantially damaged in an amount
28   The full extent of DIRECTV's damages is not fully

7

ascertained, and DIRECTV will seek leave to amend this Complaint as necessary to more fully specify DIRECTV's damages.

### SECOND CLAIM FOR RELIEF

### FRAUDULENT TRANSFER

**(Uniform Fraudulent Transfer Act, Cal. Civ. Code §§ 3439 *et seq.*)**

28.   DIRECTV incorporates by reference each and every allegation contained in paragraphs 1 through 27 as if set forth fully herein.

29.   DIRECTV is a creditor of GemsTV that is owed substantial sums from GemsTV 

30.   GemsTV has threatened to transfer or is in the process of transferring all of its assets to Gems Holdings without receiving any corresponding items of value from Gems Holdings, MMCG or any other party.   The transfer is either so far perfected that DIRECTV cannot acquire an interest that is superior to Gems Holdings or MMCG, or is deemed to have been completed prior to filing of this action pursuant to Cal. Civ. Code Section 3439.06.

31.   The transfer of assets by GemsTV as hereinbefore alleged is undertaken in bad faith and constitutes a fraudulent transfer within the meaning of Cal. Civ. Code Section 3439 et. seq.  DIRECTV is informed and believes and thereon alleges that GemsTV's transfer of assets is, amongst other things:

a)   Made with actual intent to hinder, delay and defraud DIRECTV;

b)   Made with actual knowledge that GemsTV has a contractual debt to DIRECTV of at least ▌

c)   ▌

d)  Made to an insider, namely Gems Holdings, GemsTV's parent corporation that is organized under the laws of the Cayman Islands;

e)  Made to a foreign corporation in a manner that would place the assets outside the United States in a manner that GemsTV believes would put them beyond the reach of DIRECTV;

f)  Made after GemsTV unsuccessfully attempted to re-negotiate the Contract ██████████████████ ████████████ ████████████████;

g)  Made after GemsTV and Gems Holdings representatives freely admitted GemsTV's contractual obligations ████████████████ ████████████;

h)  Predicated on a purported unilateral termination of the parties' Contract that is a plain breach of the Contract;

i)  Would render GemsTV insolvent and judgment proof against DIRECTV's claim for breach of contract;

j)  Is undertaken to maximize shareholder profits of Gems Holdings in complete disregard to the just debts of GemsTV's creditors, particularly DIRECTV.

32.  GemsTV's transfer also violates provisions of the Delaware Corporation's Code (8 Del. C. § 281(a)(4)), California Corporation's Code (Cal. Corp. C. § 2004) and Nevada Corporation's Code) (NSR 78.590(1)), all of which require that a corporation in the process of winding down take steps to pay the just debts of creditors before distributing remaining assets to shareholders.

33.  As a result of GemsTV's fraudulent transfer as hereinbefore alleged, DIRECTV has sustained and will continue to sustain actual, substantial, and irreparable harm.  DIRECTV is therefore entitled to a temporary, preliminary and permanent injunction enjoining GemsTV, its officers, agents, employees, representatives and those in active participation with it, including affiliates and parent

9

companies, from further disposition of GemsTV's assets.

### THIRD CLAIM FOR RELIEF

**Appointment of a Receiver**

**Cal. Code Civ. Proc. § 564 *et seq.***

34.   DIRECTV incorporates by reference each and every allegation contained in paragraphs 1 through 33 as if set forth fully herein.

35.   DIRECTV is entitled to have a receiver appointed to take charge of GemsTV's assets to ensure that GemsTV takes no steps to transfer or otherwise convey the assets in order to render itself judgment-proof, and to maintain the status quo of the assets and to oversee the winding down and dissolution of GemsTV.

### PRAYER FOR RELIEF

**WHEREFORE,** DIRECTV prays for judgment against Defendants as follows:

### AS TO THE FIRST CLAIM FOR RELIEF:

1. For actual damages in accordance with proof;

2. For prejudgment interest;

3. For DIRECTV's reasonable attorney's fees and costs;

### AS TO THE SECOND CLAIM FOR RELIEF:

4. For actual damages in accordance with proof;

5. For a declaration that the transfer of assets from GemsTV to Gems Holdings, MMCG or any other third-party without equivalent value is void, and that any judgment granted to DIRECTV be made a lien on said assets;

6. For a temporary, preliminary and permanent injunction enjoining GemsTV, its officers, agents, employees, representatives and those in active participation with it, including affiliates and parent companies, from further disposition of the assets transferred and/or their proceeds;

7. For an order attaching GemsTV's assets;

10

1    **AS TO THE THIRD CLAIM FOR RELIEF:**

2          8.   For the appointment of a receiver to take charge of the assets

3    transferred and/or their proceeds, to ensure that GemsTV takes no steps to transfer or

4    otherwise convey its assets in order to render itself judgment-proof, and to maintain

5    the status quo of the assets of GemsTV by overseeing the winding down and

6    dissolution of GemsTV;

7          **AS TO ALL CLAIMS FOR RELIEF:**

8          9.   For any other relief the circumstances may require;

9          10. For such other and further relief as the Court deems just and proper;

10

11         **PLAINTIFF DEMANDS A TRIAL BY JURY.**

12

13   Dated:  March 22, 2010          LOUIS A. KARASIK

14                                    ANDREW E. PARIS
                                      CASONDRA K. RUGA
15                                    MITRA M. ESKANDARI-AZARI
                                      **ALSTON & BIRD LLP**
16

17                                    _____
                                      Andrew E. Paris
18                                    Attorneys for Plaintiff
                                      DIRECTV, INC.
19

20

21

22

23

24

25

26

27

28

                                      11

EXHIBIT 1

FILED UNDER SEAL

EXHIBIT 2

FILED UNDER SEAL

EXHIBIT 3

FILED UNDER SEAL

EXHIBIT 4

FILED UNDER SEAL

EXHIBIT 5



## GEMS TV™

**Gems TV Holdings Limited**

*(Incorporated with limited liability in the Cayman Islands on April 23, 2001)*

---

### CESSATION OF BUSINESS OPERATIONS OF WHOLLY-OWNED SUBSIDIARY IN THE UNITED STATES OF AMERICA

---

1. The board of directors ("Board") of Gems TV Holdings Limited ("the **Company**") wishes to announce that, after due consideration, it has decided to cease operations of its wholly-owned subsidiary, Gems TV USA Limited ("**Gems USA**").

2. The rationale for such cessation is due to Gems USA having been unable to achieve sufficient operational and economic scale in the US market due to the challenging economic environment for the duration of its operations. In addition, the increase in the price of gold from the time Gems USA commenced its operations in November 2006 has had an adverse impact on the margins and profitability of Gems USA, as Gems USA has not been able to fully pass on such price increase to its customers.

3. The Board will be evaluating various possible options to determine an appropriate exit strategy from the US market and to extract maximum value for its shareholders. In this regard, the Board will consider all reasonable options, including but not limited to the voluntary winding-up of Gems USA and/or a sale of the assets of Gems USA. In the meantime, shareholders of the Company and potential investors are advised to exercise caution in dealing in the securities of the Company.

4. The Company is, as at the date of this Announcement, unable to assess the impact of the cessation of such US operations on the net tangible assets and earnings per share of the Company and its subsidiaries for the current financial year as such impact would be largely dependent on the option adopted to effect the said cessation. The Company will make further announcements as and when there are material developments in relation to the aforesaid matter.

5. None of the Directors or substantial shareholders of the Company has any interest, direct or indirect, in the above cessation of the US operations.

By Order of the Board

David Goh
Company Secretary
8 March 2010

EXHIBIT 6



**GEMS** TV™

**Gems TV Holdings Limited**
*(Incorporated with limited liability in the Cayman Islands on April 23, 2001)*

---

**PROPOSED INVESTMENT IN MULTIMEDIA COMMERCE GROUP INC. OF APPROXIMATELY USD60.0 MILLION**

---

## 1.   INTRODUCTION

The Board of Directors (the "**Board**") of Gems TV Holdings Limited (the "**Company**") wishes to announce that the Company had on 8 March 2010 entered into a non-binding termsheet (the "**Termsheet**") with Multimedia Commerce Group Inc. ("**MMCG**") pursuant to which the Company proposes to subscribe for approximately 37.8% (subject to adjustments) shareholding interest in MMCG for the Investment Amount (as defined below) (the "**Proposed Investment**").

## 2.   INFORMATION ON MMCG

The information set out in this Paragraph 2 is entirely based on representations and information provided by MMCG to the Company as of the date of this Announcement.

MMCG is a private corporation based in the United States of America ("**USA**" or "**US**"). MMCG operates a shopping network under the trade name "Jewelry Television®" and retails jewelry, gemstones and related products via its television network and internet sites. MMCG is a direct competitor of the Company in the US.

MMCG operates its primary retail distribution through Jewelry Television ("**JTV**") and is based in Knoxville, Tennessee, USA. JTV is a leading television home shopping network and Internet retailer specializing in the sale of jewelry, gemstones and related products. JTV's high definition programming is broadcast 24 hours a day, 7 days a week, to over 80 million unique households in the US.

Since being founded in 1993, JTV has become one of the top tier television home shopping networks and the largest focused exclusively on jewelry.  In addition, JTV's internet site, jtv.com, is the fourth largest online jewelry retailer according to Internet Retailer's Top 500 Guide 2009 edition.  Currently, JTV generates approximately 77.0% of its sales through television broadcasting and 23.0% through its Internet sites.

JTV's management team has approximately 23 years of direct industry experience and an average tenure with JTV of over 7 years.  Team members have held positions at a number of established home shopping, media, retail, consumer and technology-related



**GEMS TV™**

**Gems TV Holdings Limited**
*(Incorporated with limited liability in the Cayman Islands on April 23, 2001)*

companies. Several members of the management team hold a meaningful ownership interest in JTV as original founders and recipients of stock options.

Based on its audited consolidated accounts, JTV achieved a peak revenue of USD511.5 million for its financial year 2007. Due to the entry of the Company into the US market and the ensuing recession in the US, JTV's revenue in the trailing 12 months to 31 January 2010 fell to approximately USD300 million (unaudited). Despite this contraction in revenue, over this same period, JTV's earnings before the deduction of interest, tax, depreciation and amortisation was approximately USD16 million (unaudited).

MMCG currently intends to seek an initial public offering of its shares on the US securities exchange within a time frame of approximately 2 years following the completion of the Proposed Investment, if market conditions permit and the general economic conditions within the US improve.

### 3.   RATIONALE FOR THE PROPOSED INVESTMENT

The Company refers to its earlier announcement of today's date in which the Company had announced that it intends to cease the business operations of its wholly-owned US subsidiary, Gems TV USA Limited (**"Cessation of US Operations"**).

The Company believes that the Proposed Investment will allow the Company to continue participating in the US market through its shareholdings in MMCG upon the completion of the Proposed Investment, notwithstanding the Cessation of US Operations.

Through the injection of the Investment Amount in MMCG, the Company believes that MMCG would be able to enjoy greater economies of scale and that both the Company and MMCG will be able to benefit from the same. Upon completion of the Proposed Investment, both parties will cease to be in competition with each other and instead be able to work together to enjoy better margins, and achieve greater shareholder value.

The Board wishes to emphasize that the Cessation of the US Operations is not contingent on the completion of the Proposed Investment. The Company will cease operations of Gems USA regardless of whether or not the Proposed Investment takes place.

**Investors should note that the Termsheet represents a non-binding agreement between the Company and MMCG. In addition, the Proposed Investment is subject to certain conditions and further due diligence by the Company. Accordingly, there is no certainty or assurance as at the date of this Announcement that the parties will in due course enter into the definite binding legal agreements for the Proposed Investment as contemplated under the Termsheet. In the meantime, shareholders of the Company and potential Investors are advised to exercise caution in dealing in the securities of the Company.**

4.     **BRIEF DETAILS OF THE PROPOSED INVESTMENT**

4.1    **Termsheet**

The Termsheet represents an outline of the Proposed Investment and is non-binding.  The Company and MMCG shall use their best efforts to complete the Proposed Investment by 15 May 2010 subject to any extension of time as may be agreed in writing between the Company and MMCG.

4.2    **The Investment Amount and Number of MMCG Shares to be issued**

Pursuant to the Proposed Investment, the Company shall subscribe for 10 million shares in the capital of MMCG ("**MMCG Shares**") amounting to 37.8% of the issued and paid up capital of MMCG on an enlarged shareholding interest in MMCG, for an aggregate subscription consideration of USD60 million (subject to adjustments as described below) to be satisfied by way of the following:

(a)    cash of USD20.0 million[1];

(b)    inventories of USD20.0 million[2] (the "**Inventories**"); and

(c)    other assets and intangibles of USD20.0 million[3] (the "**Other Assets and Intangibles**").

(collectively, the "**Investment Amount**")

<u>Notes:</u>

(1)    The cash component comprises USD10 million to be paid at completion and a promissory note (on which interest shall be paid at a rate fixed at Wall Street Journal prime rate as at completion) for the balance amount of USD10 million to be paid within 12 months from completion;

(2)    Inventories include gemstones, finished jewelry (e.g. rings, necklaces etc).  For the purposes of the Proposed Investment, the value of such inventory shall be net of any financial provisions in the ordinary course of business.  The Company will transfer title to Inventories at a value of USD20.0 million to MMCG at completion; and

(3)    Other Assets and Intangibles include (i) information technology systems (or licences to use such systems) for the purpose of operating reverse auction television and internet-based sales), and (ii) intellectual property and copyrights, including rights to domain names, US patents (pending) and book rights to publications distributed by the Company in US and rights to the use of the Company's name and related marks in North America.

The Investment Amount was arrived between the Company and MMCG on a "willing-buyer and willing-seller" basis at USD6.00 per MMCG Share (subject to adjustments as described below).

4.3    **Adjustments to the number of MMCG Shares to be issued or Investment Amount**

It is intended that the Inventories be disposed of within 12 months of the completion of the Proposed Investment. The number of MMCG Shares to be issued pursuant to the Proposed Investment or the Investment Amount may be adjusted depending on the final realization value of the Inventories. In the event the realization amount exceeds USD20.0 million, the surplus would be applied towards a reduction of the promissory note component of the Investment Amount. Correspondingly, in the event that realization amount is less than USD20.0 million, the Company would receive a proportionately lesser number of MMCG Shares.

### 4.4  Source of Funds

The Company intends to fund the Proposed Investment from its internal sources.

### 4.5  Conditions to Completion of the Proposed Investment

The Proposed Investment will be conditional upon, *inter alia*, the following conditions being fulfilled:

(a)  the signing of definitive legal agreements in respect of the Proposed Investment;

(b)  approval by the relevant authorities (including the Singapore Exchange Securities Trading Limited ("SGX-ST")) and compliance with the SGX-ST Listing Manual;

(c)  approval by the shareholders of the Company at an extraordinary general meeting to be convened in due course (if required);

(d)  approval by the shareholders of MMCG; and

(e)  satisfactory completion by the Company of all legal and financial due diligence investigations in respect of the business, affairs, operations, assets, financial condition, prospects and records of MMCG.

### 4.6  Other Salient Terms

The Termsheet further provides, *inter alia*, the following terms:

(a)  the Company will be allowed to appoint 2 directors to the board of MMCG;

(b)  upon completion of the Proposed Investment, the Company will agree not to operate in the US market;

(c)  parties are to enter into an investor rights agreement; and

(d)  the Company may direct MMCG to dispose of items or groups of items of the Inventories in other channels outside of the US for cash.

### 5.  INTERESTS OF DIRECTORS AND CONTROLLING SHAREHOLDERS

To the best of the knowledge of the Board, none of the directors or controlling shareholders of the Company has any interest, whether direct or indirect, in the Proposed Investment as at the date of this Announcement.

## 6.   CIRCULAR TO SHAREHOLDERS

Upon the parties signing the definitive legal agreements for the Proposed Investment, the Company shall make the necessary follow-up announcements. The Company shall also, subject to the approval of the SGX-ST for the Proposed Investment, prepare a circular containing further details of the Proposed Investment and enclosing the notice of the EGM to be convened in connection therewith to be despatched to the shareholders of the Company in due course.

**By Order of the Board**

David Goh
Company Secretary
8 March 2010

EXHIBIT 7

**From:** Jason <Jason@lonsdale.com.sg>
**To:** Berlin, Toby
**Sent:** Sun Mar 07 21:40:10 2010
**Subject:** RE: Call with DIRECTV

Hi Tony,

Attached are the announcements we have made today. You will see reference to our proposed investment in Jewelry Television. After your response, I had gone to them to see if they would buy the business or at least become a liquidating agent for our inventory. No one else in the US can liquidate our mix of inventory as effectively. The discussions grew from there and we have agreed to help shore up their capital as a minority shareholder and they have agreed to help us liquidate remaining inventory if permitted. As I mentioned on the phone the other day, shutting was clearly not my preferred option.

We are currently running "business as usual". But as you can see from the announcements, regardless if the proposed investment in JTV goes through, we will be shutting our US operation.

I am assured that we are up to date with your outstanding invoices. Please let me know otherwise.

Let me know when we can discuss the next steps.


Regards
Jason.

3/8/2010

EXHIBIT 8

FILED UNDER SEAL

EXHIBIT 9

March 10, 2010

Ms. Toby Berlin
Vice President, Programming Acquisitions
DIRECTV, Inc.
2230 E. Imperial Highway
El Segundo, California 90245

      Re: <u>Termination of GEMS TV Affiliation Agreement</u>

Dear Toby:

      This is in response to your March 9 letter purporting to challenge the validity of the March 8, 2010 letter of Gems TV (USA) Limited ("Programmer"), terminating the Affiliation Agreement, dated August 18, 2006, as amended ("Agreement"), effective April 15, 2010.  Your letter, which does not quote any language from the Agreement, misconstrues the language in Section 6.1 and completely ignores the clarifying language in Section 6.1.3 of the Agreement.

      More specifically, Sections 6.1 and 6.1.3 of the Agreement state that:

      [T]his Agreement may be terminated by either party (the "Affected Party"), in its discretion, at any time after any of the following occurrences, except as provided in this Agreement, with respect to the other party (the "Other Party"):

      [I]f Affiliate discontinues operation of the DTH Distribution System, or Programmer discontinues operation and distribution of the Service.

As I confirmed during our telephone conversation today, Programmer is discontinuing operation and distribution of the Service, effective April 15, 2010.

      The remainder of Section 6.1.3 removes any doubt that Programmer may terminate the Agreement without any further liability to DIRECTV other than accrued liabilities under Section 6.5:

      **Neither party shall have any further liability to the other**, other than as set forth in Section 6.5 below, **for the discontinuance of the DTH Distribution System or the Service**, as the case may be; provided that such discontinuance is not in connection with, and does not arise from, Affiliate's or Programmer's breach of this Agreement. (emphasis added)

Your assertion that Programmer is obligated to pay Fees through the remainder of the Term is directly contrary to this unambiguous language in Section 6.1.3.

      Programmer has provided more than a month's notice of its cessation of the Service.  Rather than making unfounded claims against Programmer, DIRECTV should undertake to utilize the channel when it becomes available. I think that it would be more constructive if we discuss the logistics of the termination and am available to do so.

      Sincerely,

      Diane Schneiderjohn
      President

EXHIBIT 10

PROSPECTUS DATED NOVEMBER 3, 2006



*Gems* TV™

Integrated Manufacturer and Television Home Shopping Retailer
of Colored Gemstone Jewelry

# Gems TV Holdings Limited

(incorporated with limited liability in the Cayman Islands on April 23, 2001)

**285,767,000 Offering Shares** (subject to the Over-allotment Option)  |  Offering Price: S$1.08 per Offering Share












**This document is important. If you are in any doubt as to the action you should take, you should consult your legal, financial, tax or other professional advisor.**

This is the initial public offering of our ordinary shares of par value US$0.001 each (the "Shares"). Gems TV Holdings Limited is issuing and making an offering of 206,660,000 Shares (the "Issue Shares"), and the Vendors (as defined herein) are making an offering of 79,107,000 Shares (the "Vendor Shares" and together with the Issue Shares, the "Offering Shares") for subscription and/or purchase by investors at the Offering Price. The Offering (as defined below) consists of (i) an international placement (the "Placement") of 271,478,000 Offering Shares to investors, including institutional and other investors in Singapore, and (ii) an offering to the public in Singapore (the "Public Offer" and together with the Placement, the "Offering") of 14,289,000 Offering Shares, including 2,000,000 Offering Shares (the "Reserved Shares") reserved for subscription and/or purchase by our employees, and our business associates and others who have contributed to our success and development (to be determined by us at our sole discretion), subject to clawback and re-allocation.

Prior to the Offering, there has been no public market for our Shares. An application has been made to the Singapore Exchange Securities Trading Limited (the "SGX-ST") for permission to list all our issued Shares (including the Offering Shares) and the new Shares to be issued pursuant to the vesting of awards granted under our Gems TV Performance Share Plan (the "Performance Share Plan") and our Gems TV Restricted Stock Plan (the "Restricted Stock Plan") on the Main Board of the SGX-ST. Such permission for the listing of our Shares will be granted when we have been admitted to the Official List of the SGX-ST. Acceptance of applications for the Offering Shares will be conditional upon, among other things, permission being granted to deal in and for quotation of all our issued Shares (including the Offering Shares) and the new Shares to be issued pursuant to the vesting of awards granted under our Performance Share Plan and our Restricted Stock Plan. Monies paid in respect of any application accepted will be returned, at each investor's own risk, without interest or any share of revenue or other benefit arising therefrom, and without any right or claim against us, the Vendors or Credit Suisse (Singapore) Limited or DBS Bank Ltd, if the Offering is not completed because the said permission is not granted or for any other reason. We will not receive any of the proceeds from the sale of Vendor Shares, including any Shares sold pursuant to the Over-allotment Option (as defined below).

We have received a letter of eligibility from the SGX-ST for the listing and quotation of our issued Shares (including the Offering Shares) and the new Shares to be issued pursuant to vesting of awards granted under our Performance Share Plan and our Restricted Stock Plan on the Main Board of the SGX-ST. The SGX-ST assumes no responsibility for the correctness of any statements or opinions made or reports contained in this Prospectus. Our eligibility to list and admission to the Official List of the SGX-ST are not to be taken as an indication of the merits of the Offering, us, our Group (as defined herein) or our issued Shares (including the Offering Shares) and the new Shares to be issued pursuant to the vesting of awards granted under our Performance Share Plan and our Restricted Stock Plan.

A copy of this Prospectus has been lodged with and registered by the Monetary Authority of Singapore (the "Authority") on October 11, 2006 and November 3, 2006 respectively. The Authority assumes no responsibility for the contents of this Prospectus. Registration of this Prospectus by the Authority does not imply that the Securities and Futures Act, Chapter 289 of Singapore, or any other legal or regulatory requirements, have been complied with. The Authority has not, in any way, considered the merits of our Shares being offered or in respect of which an invitation is made, for investment. No Shares shall be allotted or allocated on the basis of this Prospectus later than six months after the date of registration of this Prospectus by the Authority.

**Investing in our Shares involves risks. See "Risk Factors" on page 17 for a discussion of certain factors to be considered in connection with an investment in our Shares.**

In connection with the Offering, Clive Bryant, has granted to Credit Suisse (Singapore) Limited an over-allotment option (the "Over-allotment Option"), exercisable by Credit Suisse (Singapore) Limited in full or in part no later than the earliest of (i) the date falling 30 days from the commencement of trading of the Shares on the SGX-ST; or (ii) the date when Credit Suisse (Singapore) Limited has bought, on the SGX-ST, an aggregate of 42,866,000 Shares, representing approximately 15% of the total Offering Shares, to undertake stabilizing actions; or (iii) the date falling 30 days after the date of adequate public disclosure of the Offering Price, to purchase up to an aggregate of 42,866,000 Shares (representing approximately 15% of the total Offering Shares) at the Offering Price, solely to cover the over-allotment of the Offering Shares, if any. The total number of issued Shares immediately after the completion of the Offering will be 1,030,300,010 Shares. The total number of issued Shares immediately after the completion of the Offering will not change as a result of the exercise of the Over-allotment Option.

The Shares in the Offering have not been and will not be registered under the U.S. Securities Act of 1933, as amended (the "Securities Act"). The Shares in the Offering may not be offered or sold within the United States or to, or for the account or benefit of, U.S. persons (as defined in Regulation S under the Securities Act ("Regulation S")), except to "qualified institutional buyers" in reliance on the exemption from registration provided by Rule 144A under the Securities Act ("Rule 144A") and to certain non-U.S. persons in offshore transactions in reliance on Regulation S. Prospective investors are hereby notified that sellers of our Shares may be relying on the exemption from the provisions of Section 5 of the Securities Act provided by Rule 144A. For further details about restrictions on offers, sales and transfers of our Shares, see "Plan of Distribution" and "Transfer Restrictions."

Investors applying for the Offering Shares under the Public Offer by way of Application Forms or Electronic Applications (both as referred to in the instructions booklet entitled "Terms, Conditions and Procedures for Application for the Offering Shares under the Public Offer") will pay the Offering Price per Offering Share on application, subject to a refund of the full amount or, as the case may be, the balance of the application monies (in each case without interest or any share of revenue or other benefit arising therefrom), where (i) an application is rejected or accepted in part only; or (ii) if the Offering does not proceed for any reason.

All copies of this Prospectus distributed in Singapore must be accompanied by the instructions booklet entitled "Terms, Conditions and Procedures for Application for the Offering Shares under the Public Offer," which constitutes part of this Prospectus registered with the Authority.

SOLE GLOBAL COORDINATOR AND BOOKRUNNER

**CREDIT SUISSE**

JOINT UNDERWRITER AND COORDINATOR OF THE PUBLIC OFFER AND SUB-PLACEMENT AGENT

**✕ DBS**

SUB-PLACEMENT AGENT

**✕ CIMB**

In connection with the Offering, Credit Suisse (Singapore) Limited, the stabilizing manager (or persons acting on behalf of Credit Suisse (Singapore) Limited), may over-allot Shares or effect transactions which may stabilize or maintain the market price of our Shares at levels that might not otherwise prevail in the open market. Such transactions may be effected on the SGX-ST and in other jurisdictions where it is permissible to do so, in each case in compliance with all applicable laws and regulations, including the Securities and Futures Act and any regulations thereunder. However, there is no assurance that Credit Suisse (Singapore) Limited (or persons acting on behalf of Credit Suisse (Singapore) Limited) will undertake any such stabilization actions. Such transactions may commence on or after the commencement of trading of the Shares on the SGX-ST and, if commenced, may be discontinued at any time and shall not be effected after the earliest of (i) the date falling 30 days from the commencement of trading of the Shares on the SGX-ST; or (ii) the date when Credit Suisse (Singapore) Limited has bought, on the SGX-ST, an aggregate of 42,866,000 Shares, representing approximately 15% of the total Offering Shares, to undertake stabilizing actions; or (iii) the date falling 30 days after the date of adequate public disclosure of the Offering Price.

## NOTICE TO NEW HAMPSHIRE RESIDENTS

**Neither the fact that a registration statement or an application for a license has been filed under Chapter 421-B of the New Hampshire Revised Statutes ("RSA 421-B") with the State of New Hampshire nor the fact that a security is effectively registered or a person is licensed in the State of New Hampshire constitutes a finding by the Secretary of State that any document filed under RSA 421-B is true, complete and not misleading. Neither any such fact nor the fact that an exemption or exception is available for a security or transaction means that the Secretary of State has passed in any way upon the merits or qualifications of, or recommended or given approval to, any person, security or transaction. It is unlawful to make, or cause to be made, to any prospective purchaser, customer or client any representation inconsistent with the provisions of this paragraph.**

## AVAILABLE INFORMATION

We have agreed that, for so long as any Shares are "restricted securities" within the meaning of Rule 144(a)(3) under the Securities Act, we will, during any period in which we are neither subject to Section 13 or 15(d) of the U.S. Securities Exchange Act of 1934, as amended (the "Exchange Act"), nor exempt from reporting pursuant to Rule 12g3-2(b) thereunder, provide to any holder or beneficial owner of such restricted securities or to any prospective purchaser of such restricted securities designated by such holder or beneficial owner for delivery to such holder, beneficial owner or prospective purchaser, in each case upon the request of such holder, beneficial owner or prospective purchaser, the information required to be provided by Rule 144A(d)(4) under the Securities Act.

## ENFORCEABILITY OF CIVIL LIABILITIES

We are a limited liability company incorporated under the laws of the Cayman Islands. All of our directors (the "Directors"), most of our management and all of the Vendors and, where applicable, their directors and management, our auditors and certain of the other parties named in this document reside outside the United States. All or a substantial portion of our assets, the assets of the Vendors and the assets of the persons referred to in the preceding sentence are located outside the United States. As a result, it may not be possible for investors to effect service of process within the United States upon us or such persons, or to enforce in the United States any judgment obtained in the United States courts against us, the Vendors or any of such persons, including judgments based upon the civil liability provisions of the securities laws of the United States or any state or territory of the United States. There is uncertainty as to whether the courts of the Cayman Islands would recognize and enforce judgments of United States courts obtained against us or our Directors or officers as well as against the Vendors or, where applicable, their directors and management predicated upon the civil liability provisions of the securities laws of the United States or any state in the United States or entertain original actions brought in Cayman Islands courts against us or our Directors or officers as well as against the Vendors or, where applicable, their directors and management predicated upon the securities laws of the United States or any state in the United States.

of our Shares who are U.S. persons (as defined in Regulation S) or have a registered address in the United States unless:

- a registration statement is in effect, if a registration statement under the Securities Act is required in order for us to offer such rights to holders and sell the securities represented by such rights; or

- the offering and sale of such rights or the underlying securities to such holders are exempt from registration under the provisions of the Securities Act.

We have no obligation to prepare or file any registration statement under the Securities Act. Accordingly, shareholders who are U.S. persons (as defined in Regulation S) or have a registered address in the United States may be unable to participate in rights offerings and may experience a dilution in their holdings as a result.

### *Corporate disclosure and accounting standards in Singapore may vary from those in other jurisdictions, and such variations may have a material adverse effect on our financial statements and results of operations.*

There may be different publicly available information about companies listed on the SGX-ST, such as ours, than is regularly made available by public companies in the United States and in other jurisdictions. These differences include the timing and content of disclosure of beneficial ownership of equity securities of officers, directors and significant shareholders; officer certification of disclosure and financial statements in periodic public reports; and disclosure of off-balance sheet transactions in management's discussion of results of operations in periodic public reports.

In addition, our financial statements are prepared in accordance with IFRS, which differs in material significant respects from U.S. GAAP. See "Summary of Principal Differences between IFRS and U.S. GAAP." We have not quantified or identified the effects of the aforementioned differences between IFRS and U.S. GAAP in this document. Accordingly, there can be no assurance, for example, that profit after taxation distributable by us and share capital and reserves reported in accordance with IFRS would not be lower if determined in accordance with U.S. GAAP. Potential investors should consult their own professional advisors if they want to understand the differences between IFRS and U.S. GAAP and how they might affect the information contained herein.

### *Our management has broad discretion on how to use the proceeds from the Offering, which may result in an application of the net proceeds in a manner not favored by investors.*

Presently, we intend to use the proceeds from the Offering for the expansion of our operations into the United States and other geographic markets, to expand our manufacturing and related facilities in Chanthaburi, Thailand and outside of Thailand, to upgrade our existing facilities in the UK, and the remainder for working capital and general corporate purposes. See "Use of Proceeds." While we expect to use the specific amounts of net proceeds listed under "Use of Proceeds" for each of the foregoing purposes, these amounts and uses may change, and this may result in an application of the net proceeds in a manner not favored by investors.

### *There may be difficulties in enforcing foreign judgments against us or our management as well as against the Vendors or their management.*

We are incorporated in the Cayman Islands. All of our Directors, most of our management and all of the Vendors and, where applicable, their directors and management, and certain of the other parties named in this document reside outside the United States. Certain of our Directors, most of our management and all of the Vendors and, where applicable, their directors and management, and certain of the other parties named in this document reside outside Singapore. All of our assets are located outside Singapore and all or a substantial portion of our and such persons' assets are located outside the United States. As a result, it may be difficult or impossible for investors to effect service of process upon us within Singapore or upon us or such persons within the United States or other jurisdictions, including judgments predicated upon the civil liability provisions of the securities laws of Singapore or as the case may be the federal securities laws of the United States. See "Enforceability of Civil Liabilities."

In particular, investors should be aware that there is uncertainty as to whether the courts of the Cayman Islands would recognize and enforce judgments of Singapore courts or United States courts obtained against us or our Directors or officers as well as against the Vendors or, where applicable, their directors and management predicated upon the civil liability provisions of the the securities laws of Singapore or as the

case may be securities laws of the United States or any state in the United States or entertain original actions brought in Cayman Islands courts against us or our Directors or officers as well as against the Vendors or, where applicable, their directors and management predicated upon the securities laws of Singapore or the United States or any state in the United States.

*Investors may face a delay in the return of their subscription monies if our Shares are not listed on the SGX-ST.*

If the listing of our Shares does not occur for any reason (including instances where a stop order under the Securities and Futures Act has been issued), and if we have already issued the Issue Shares, we will be required under applicable Singapore laws and regulations to return the subscription monies to investors. In this instance, we will consider the various options that may be available to us, subject to compliance with Cayman Companies Law and our Articles, to enable us to return the monies to investors, including the repurchase by us of the Issue Shares at the Offering Price. Information relating to the repurchase of Shares by our Company is set out in "Appendix — Summary of Cayman Islands Company Law — Purchase of Shares and Warrants by a Company and its Subsidiaries." Return of such monies may take a considerable amount of time and may not be completed within the time periods required under applicable Singapore laws and regulations, or at all and, as a result, we may be in breach of applicable Singapore laws and regulations.

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge Dean D. Pregerson and the assigned discovery Magistrate Judge is Rosalyn M. Chapman.

The case number on all documents filed with the Court should read as follows:

## CV10- 2061 DDP (RCx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

===================================================

## NOTICE TO COUNSEL

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| [X] Western Division | [ ] Southern Division | [ ] Eastern Division |
|---|---|---|
| 312 N. Spring St., Rm. G-8 | 411 West Fourth St., Rm. 1-053 | 3470 Twelfth St., Rm. 134 |
| Los Angeles, CA 90012 | Santa Ana, CA 92701-4516 | Riverside, CA 92501 |

Failure to file at the proper location will result in your documents being returned to you.

Louis A. Karasik (State Bar No. 100672)
Andrew E. Paris (State Bar No. 162562)
Casondra K. Ruga (State Bar No. 237597)
ALSTON & BIRD LLP
333 South Hope Street, 16th Floor
Los Angeles, California 90071
Phone: (213) 576-1000
Fax: (213) 576-1100

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DIRECTV, INC., a California corporation<br><div align="right">PLAINTIFF(S)</div><br>V.<br><br>GEMS TV (USA) Limited, a Delaware corporation<br><div align="right">DEFENDANT(S).</div> | CASE NUMBER<br><br>CV 10-02061 -DDP(CWx)<br><br><br>**SUMMONS** |

TO: DEFENDANT(S): GEMS TV (USA) Limited

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☒ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff's attorney, Louis A. Karasik , whose address is 333 South Hope Street, 16th Floor, Los Angeles, California, 90071     . If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

Clerk, U.S. District Court

Dated:  22 MAR 2010

By:  _____
MARLENE DAVIS
Deputy Clerk

SEAL

(Seal of the Court)

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States. Allowed 60 days by Rule 12(a)(3)].*

American LegalNet, Inc.
www.USCourtForms.com

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
CIVIL COVER SHEET

**I (a) PLAINTIFFS** (Check box if you are representing yourself ☐)
DIRECTV, INC.

**DEFENDANTS**
GEMS TV (USA) Limited

**(b)** Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)
ANDREW E. PARIS (State Bar No. 162562)
ALSTON & BIRD LLP
333 South Hope Street
Los Angeles, California 90071
(213) 576-1000

Attorneys (If Known)

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff
☐ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant
☒ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☒ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify):
☐ 6 Multi-District Litigation
☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☒ Yes ☐ No (Check 'Yes' only if demanded in complaint.)
**CLASS ACTION under F.R.C.P. 23:** ☐ Yes ☒ No ☒ **MONEY DEMANDED IN COMPLAINT:** $ Exceeds $75,000.00

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
Breach of Contract, Fraudulent Conveyance & For Appointment of Receiver

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | ☐ 530 General | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 535 Death Penalty | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 540 Mandamus/Other | ☐ 740 Railway Labor Act |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | **BANKRUPTCY** | ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | ☐ 151 Medicare Act | ☐ 345 Marine Product Liability | ☐ 22 Appeal 28 USC 158 | ☐ 555 Prison Condition | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | **FORFEITURE/PENALTY** | **PROPERTY RIGHTS** |
| ☐ 490 Cable/Sat TV | ☐ 355 Motor Vehicle Product Liability | | **CIVIL RIGHTS** | ☐ 610 Agriculture | ☐ 820 Copyrights |
| ☐ 810 Selective Service | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 620 Other Food & Drug | ☐ 830 Patent |
| ☐ 850 Securities/Commodities/ Exchange | ☐ 160 Stockholders' Suits | ☐ 362 Personal Injury- Med Malpractice | ☐ 442 Employment | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 840 Trademark |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 190 Other Contract | ☐ 365 Personal Injury- Product Liability | ☐ 443 Housing/Acco-mmodations | | **SOCIAL SECURITY** |
| ☐ 890 Other Statutory Actions | ☐ 195 Contract Product Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | ☐ 630 Liquor Laws | ☐ 61 HIA(1395ff) |
| ☐ 891 Agricultural Act | ☐ 196 Franchise | | ☐ 445 American with Disabilities – Employment | ☐ 640 R.R.& Truck | ☐ 862 Black Lung (923) |
| ☐ 892 Economic Stabilization Act | **REAL PROPERTY** | | ☐ 446 American with Disabilities – Other | ☐ 650 Airline Regs | ☐ 863 DIWC/DIWW 405(g)) |
| ☐ 893 Environmental Matters | ☐ 210 Land Condemnation | | | ☐ 660 Occupational Safety /Health | ☐ 864 SSID Title XVI |
| ☐ 894 Energy Allocation Act | ☐ 220 Foreclosure | **IMMIGRATION** | ☐ 440 Other Civil Rights | ☐ 690 Other | ☐ 865 RSI (405(g)) |
| ☐ 895 Freedom of Info. Act | ☐ 230 Rent Lease & Ejectment | ☐ 462 Naturalization Application | | | **FEDERAL TAX SUITS** |
| ☐ 900 Appeal of Fee Determi- nation Under Equal Access to Justice | ☐ 240 Torts to Land | ☐ 463 Habeas Corpus- Alien Detainee | | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 950 Constitutionality of State Statutes | ☐ 245 Tort Product Liability | ☐ 465 Other Immigration Actions | | | ☐ 871 IRS-Third Party 26 USC 7609 |
| | ☐ 290 All Other Real Property | | | | |

**FOR OFFICE USE ONLY:** Case Number: CV10-02061

**AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.**

CV-71 (05/08) — CIVIL COVER SHEET — Page 1 of 2

American LegalNet, Inc.
www.FormsWorkflow.com

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
CIVIL COVER SHEET

**VIII(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed? ☒ No ☐ Yes

If yes, list case number(s): _____

**VIII(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case? ☒ No ☐ Yes

If yes, list case number(s): _____

Civil cases are deemed related if a previously filed case and the present case:

(Check all boxes that apply)    ☐ A. Arise from the same or closely related transactions, happenings, or events; or

        ☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or

        ☐ C. For other reasons would entail substantial duplication of labor if heard by different judges; or

        ☐ D. Involve the same patent, trademark or copyright, __and__ one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a)   List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named plaintiff resides.

☐   Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles County | |

(b)   List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named defendant resides.

☐   Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| | State of Delaware |

(c)   List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH claim arose.

     **Note: In land condemnation cases, use the location of the tract of land involved.**

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles County | |

* **Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties**

Note: In land condemnation cases, use the location of the tract of land involved

X. SIGNATURE OF ATTORNEY (OR PRO PER):                    Date   March 22, 2010

ANDREW E. PARIS, Attorney for Plaintiff DIRECTV, INC.

Notice to Counsel/Parties: The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3 -1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |

American LegalNet, Inc.
www.FormsWorkflow.com

FILED

10 MAR 22 PM 4: 35

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

BY:_____

1  Louis A. Karasik (State Bar No. 100672)
   lou.karasik@alston.com
2  Andrew E. Paris (State Bar No. 162562)
   drew.paris@alston.com
3  Casondra K. Ruga (State Bar No. 237597)
   casondra.ruga@alston.com
4  Mitra M. Eskandari-Azari (State Bar No. 261978)
   mitra.azari@alston.com
5  **ALSTON & BIRD LLP**
   333 South Hope Street
6  Suite 1600
   Los Angeles, California 90071
7  Telephone:  (213) 576-1000
   Facsimile:  (213) 576-1100
8
9  Attorneys for Plaintiff,
   **DIRECTV, INC.**
10
11                **UNITED STATES DISTRICT COURT**
12                **CENTRAL DISTRICT OF CALIFORNIA**
13
14  DIRECTV, INC., a California corporation,     Case No. **CV 10- 02061 DDT (PLA(x)**
15                    Plaintiff,
                                                 **[REDACTED] COMPLAINT FOR:**
16         v.
                                                 **1.   BREACH OF CONTRACT**
17  GEMS TV (USA) Limited, a Delaware
18  corporation                                  **2.   FRAUDULENT CONVEYANCE
                                                       (Uniform Fraudulent Transfer
19                    Defendant.                        Act, Cal. Civ. Code § 3439 et seq.)**
20                                               **3.   FOR APPOINTMENT OF
                                                       RECEIVER (Cal. Code Civ.
21                                                      Proc. § 564 et seq.)**
22
23                                               **DEMAND FOR JURY TRIAL**
24
25
26
27
28

LEGAL02/31815532v4

1